Rebecca Garcia STRICKLAND *v.*
ARKANSAS DEPARTMENT of HUMAN SERVICES

CA 08-441                                                287 S.W.3d 633

Court of Appeals of Arkansas
Opinion delivered September 24, 2008

[Rehearing denied October 22, 2008.]

*Deborah R. Sallings,* Arkansas Public Defender Commission, for appellant.

*Tabitha Baertels McNulty,* Office of Chief Counsel, for appellee.

*Greg Fallon*, attorney ad litem.

WENDELL L. GRIFFEN, Judge. Appellant Rebecca Garcia Strickland appeals from an order terminating her parental rights in CS (born August 13, 2003) and JS (born August 5, 2005). She argues that there was insufficient evidence to warrant termination. We agree and reverse the termination order.

## I. Background Information

Appellant is a twenty-six-year-old resident of Drew County. Both of her children suffer from developmental delays, and JS suffers from numerous physical problems as well. In January 2006, the Arkansas Department of Human Services (DHS) submitted an affidavit to the Drew County Circuit Court, seeking emergency custody of the children. The affidavit stated that JS was not attending a Kids First daycare program as prescribed by his doctor; that, when JS did attend, he arrived dirty and needing a bath; and that appellant had picked the children up from daycare in a vehicle with no child seats, accompanied by a cousin who smelled of alcohol. The circuit court granted emergency custody to DHS on February 3, 2006.

On March 31, 2006, CS and JS were adjudicated dependent-neglected. The court approved a goal of parental reunification and directed appellant to obtain stable housing, employment, and transportation; complete parenting classes; and obey court orders and the case plan. Subsequent review orders in June and July 2006 found that appellant had completed parenting classes, assisted with the children's transportation, visited the children, and maintained stable housing since May 2006. The court allowed an increase in appellant's visitation.

An October 12, 2006, review order continued the goal of reunification. The court observed that appellant had attended all of JS's medical appointments and had moved in September 2006 due to a break-in at her home. Appellant was directed to re-enroll in parenting classes, maintain stable housing, and obey the case plan and court orders.

In January 2007, DHS reported that appellant "has done well in the past year." The report stated that appellant had complied with court orders and the case plan; maintained stable

housing and transportation; kept the children overnight on a weekly basis; and ensured the children's health and safety needs when they were in her care.

A permanency-planning hearing, scheduled for January 2007, was continued based on appellant's separation from her husband, Jose Garcia-Lopez.[1] Several additional continuances involving Mr. Garcia-Lopez resulted in the permanency-planning hearing not being held until July 12, 2007. Interim court reports and case plans state that appellant did not have stable transportation; had been living in her aunt's home for six months; and had been encouraged by DHS to obtain her own home.

On August 21, 2007, the court entered a permanency-planning order, stating that reunification was expected by January 1, 2008, based on appellant's significant progress toward achieving the case-plan goals and her diligent work toward reunification. However, the court pointed out that, while appellant had obtained a car, she had not had her driver's license reinstated and had not maintained stable housing or attended all of JS's medical appointments (though it was possible she had not received notice of every appointment). Appellant was ordered to attend JS's medical appointments; notify DHS if she needed transportation to the appointments; obtain and maintain a safe and stable home; complete another parenting course; maintain visitation; reinstate her driver's license; and have adequate transportation.

According to DHS reports, appellant made unsuccessful attempts after the hearing to live with her mother and her grandmother. She then obtained her own apartment in September 2007. On October 4, 2007 — before the predicted reunification date and only six weeks after the last order — DHS filed a petition to terminate appellant's parental rights. On the same day the petition was filed, the court entered a fifteen-month review order, changing the goal of the case to termination of parental rights and adoption. The court found that appellant had completed parenting classes, visited the children, and attended JS's medical appointments but failed to acquire stable transportation or maintain stable housing, having moved three times since the last hearing.

---

[1] Mr. Garcia-Lopez was the father of JS. His parental rights were also terminated. He does not appeal the termination in this proceeding.

## II. The Termination Hearing

A termination hearing was held on December 13, 2007. Adoption specialist Marrianne Cruce testified that the children were adoptable and that DHS had families for them. Family service worker Jennifer Harper testified that appellant was in partial compliance with the case plan, having completed her parenting classes. However, Harper said, appellant had not acquired stable transportation, was not employed, and had not maintained stable housing for a year, as designated in the case plan. With regard to transportation, Harper admitted that the case plan did not require appellant to own a vehicle and that appellant could comply with the case plan by having readily available transportation. She further acknowledged that the children would not necessarily be endangered by appellant's relying on others for transportation. Harper also testified that appellant was unemployed due to a disability and received SSI payments of $623 per month. Harper said that appellant could possibly support herself and the children on that income. As for housing, Harper testified that appellant had moved eight times since the case began, prior to moving to her current one-bedroom apartment in September 2007. According to Harper, JS's medical needs required stable housing. She referenced a letter from Dr. Maryelle Vonlanthen, which stated that JS's weight gains varied with changes in his living conditions.

CASA volunteer Cynthia Pope testified that she recommended termination of parental rights. Her recommendation was based on appellant's purported failure to meet three basic requirements of the case plan — stable housing, reliable transportation, and employment. Pope stated, however, that appellant "has a support system in place for her transportation." She also placed a CASA court report into evidence. The report stated, if appellant continued to move frequently, the children's medical and emotional well-being could be disrupted. However, it also stated that appellant had no desire to vacate her apartment, that all utilities were in working order, and that appellant could possibly obtain a larger apartment when the children were returned to her. Additionally, the report stated that appellant could be situationally depressed. It referred to appellant's psychological evaluation, which described appellant's limited intellectual functioning and cognitive abilities, though it made no recommendation about reunification. Finally, the report noted that appellant was working hard to improve herself and was trying for her GED; that appellant understood the importance of her children's education; that she

loved her children and strongly desired that they be returned to her care; that appellant demonstrated an adequate ability to care for her home; that family members in the area assisted her with transportation; and that appellant "frequently stated her spiritual beliefs and how she used this for guidance and strength."

Appellant testified that she suffered from a learning disability and had trouble spelling and reading. Because of this, she received $623 in disability payments and food stamps, which covered expenses with money left over. She testified that she had completed three sets of parenting classes and that she visited her children every week. Further, she had acquired a driver's license. However, she relied on her aunt, who lived in the same apartment complex, or her mother, who lived about twenty minutes away, for transportation. She also said that she could use the Medicaid bus. Appellant said that she understood JS's medical condition and received training from Arkansas Children's Hospital on how to care for him. She also said that she had attended all of JS's medical appointments that she knew of except one. Appellant said she intended to stay in her apartment complex and would be transferred to a three-bedroom apartment if the children were returned to her. On cross-examination, she testified that her rights had been terminated as to another child and possibly second, although the testimony is unclear. Appellant also said on cross-examination that she did not think she needed counseling, but she would go if she were ordered to.

On rebuttal, Jennifer Harper testified that appellant was not notified about some of JS's doctor appointments, but appellant did miss three appointments to which she was "invited."

### III. The Termination Decision

Following the hearing, the court entered an order terminating appellant's parental rights. The court found that appellant had not been in a stable home environment due to her frequent moves; that appellant's SSI income might not be enough to support the children; that appellant could not understand some of JS's medical needs; that appellant could not read well; and that appellant was depressed, yet declined to seek treatment. Based on these findings, the court ruled that termination was in the children's best interest and that the following grounds for termination were proved: 1) the children were adjudicated dependent-neglected and continued out of appellant's custody for twelve months and, despite a meaningful effort by DHS to rehabilitate appellant and correct the

conditions that caused removal, those conditions have not been remedied by appellant; 2) the children lived outside appellant's home for a period of twelve months, and appellant willfully failed to provide significant material support in accordance with her means or maintain meaningful contact with the children; 3) other factors or issues arose subsequent to filing the original dependency–neglect petition that demonstrate a return of the children to appellant is contrary to their health, safety, or welfare and that, despite the offer of appropriate family services, appellant has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the circumstances that prevent return of the children to her. Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*); (ii)(*a*); and (vii)(*a*) (Repl. 2008). Appellant filed a timely notice of appeal from the termination order.

## IV. Standard of Review

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Smith v. Ark. Dep't of Human Servs.*, 100 Ark. App. 74, 264 S.W.3d 559 (2007). A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007). Clear and convincing evidence is that degree of proof which will produce in the fact–finder a firm conviction regarding the allegation sought to be established. *Smith, supra.* This standard of proof reduces the possibility that a parent's rights are terminated based solely on a few isolated instances of unusual conduct or idiosyncratic behavior and impresses the fact–finder with the importance of the decision, thereby perhaps reducing the chances that inappropriate terminations will be ordered. *See Santosky v. Kramer*, 455 U.S. 745 (1982). However, courts are not to enforce parental rights to the detriment or destruction of the health and well–being of the child. *Smith, supra.*

The law presumes that a fit parent acts in the best interests of his or her children. *See Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). While there is still reason to believe there can be a positive, nurturing parent-child relationship, the law favors preservation, not severance, of natural familial bonds. *Santosky, supra.* The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships

are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Id.*

Our termination statute requires clear and convincing proof that termination is in the child's best interest, plus clear and convincing proof of at least one of the enumerated grounds for termination. *See Smith, supra.* We do not reverse the circuit court's finding of clear and convincing evidence unless that finding is clearly erroneous. *See id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Our review is de novo. *Williams v. Ark. Dep't of Human Servs.,* 99 Ark. App. 95, 257 S.W.3d 574 (2007).

## Discussion

We are firmly convinced that the circuit court erred in terminating appellant's parental rights. When reviewing termination cases, we are ever mindful of the extraordinary nature of that remedy. As noted above, a heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Albright, supra.* Often, this burden is met by a showing of physical or emotional abuse, drug or alcohol abuse, parental indifference, abandonment, severe psychological disturbances, or environmental neglect. Those factors are noticeably absent here. Instead, the termination decision, which forever severed appellant's parental bonds with CS and JS, was primarily informed by appellant's numerous moves during the time she was awaiting reunification with her children.

The evidence showed that appellant moved away from her mother shortly after the children were placed in DHS custody. She later lived with Mr. Garcia-Lopez, but they moved after a criminal incident at their home. She moved again when she separated from Mr. Garcia-Lopez, and lived in her aunt's house for six months, according to at least one DHS report. When she was encouraged by DHS to get her own place, she apparently tried to live with her mother and her grandmother for brief periods. She then acquired her own apartment. By the time of the termination hearing, she had been living in the apartment for approximately three months. At least one other move took place during the case, but the circumstances are not explained in the record.

Unquestionably, appellant was under orders from the trial court to maintain stable housing. The case plan required her to do

so for one year. However, nothing in the court orders or case plan required appellant to stay in a fixed location in order to meet that requirement. Appellant always maintained some type of housing, and DHS presented no clear and convincing evidence that any of her residences were unsafe or inappropriate. DHS cites the moves as evidence of an unusually peripatetic or unstable personality, but there are logical explanations for many of the moves. Moreover, they equally connote a continual striving by appellant to maintain suitable housing despite her circumstances.

We believe the termination decision is too important to rest on this factor, given the entirety of the evidence in this case. As late as August 2007, the court lauded appellant's progress and predicted imminent reunification. Appellant is unquestionably devoted to her children and visited them faithfully throughout the case. Her completion of three sets of parenting classes is a testament to her determination to abide by the case plan and court orders. And, while it appears she may have missed some of JS's doctor's appointments during this two-year case, the record reveals some confusion as to whether she received notification of all appointments.

Further, there was no clear and convincing evidence that appellant's limited cognitive abilities or her possible depression, which was not shown to be anything other than situational, adversely affected her ability to parent JS and CS. Nor was there clear and convincing evidence that appellant's meager income rendered her unfit. Appellant testified that her disability payments and food stamps covered what few expenses she had, with money left over. DHS witness Jennifer Harper testified that appellant could possibly support herself and the children on that income. It is also noteworthy that, when appellant lost her vehicle after separating from Mr. Garcia-Lopez, she was able to establish a transportation support system that no DHS witness could seriously fault. Jennifer Harper testified that appellant's obligation to acquire stable transportation did not necessarily require ownership of a car.

We therefore reverse the termination order. The circuit court is directed to conduct an immediate review hearing and either return the children to appellant's custody or continue reunification services, as appropriate.

Reversed and remanded.

HART and HUNT, JJ., agree.