2010 Ark. App. 167

**Kadrian THOMPSON, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,
Appellee.**

**No. CA 09–1053.**

Court of Appeals of Arkansas.

Feb. 17, 2010.

Leah Beth Lanford, Arkansas Public Defender Com'n, Little Rock, for appellant.

Chrestman Group, PLLC, Jonesboro, by: Keith L. Chrestman; Tabitha Baertels McNulty, Dept. of Human Services, Office of Chief Counsel, Little Rock, for appellees.

COURTNEY HUDSON HENRY, Judge.

Appellant Kadrian Thompson appeals the order of the Pulaski County Circuit Court that terminated her parental rights to her daughter, K.T., who was born on October 2, 2007. For reversal, she argues that the trial court erred in finding that termination was in the child's best interest and in finding that grounds existed to justify termination. We affirm.

The record reflects that appellant, a resident of Arkansas, gave birth to K.T. in Memphis, Tennessee, while on a trip to Tunica, Mississippi. Appellee, the Arkansas Department of Human Services (DHS), received a report that the child tested positive for cocaine at birth and that appellant tested positive for cocaine and marijuana at the time of delivery. On October 4, 2007, DHS personnel contacted appellant at her home in Little Rock and obtained her verbal agreement to come to the local DHS office. When appellant did not appear, the caseworker visited appellant's home. Appellant became combative and verbally threatened the caseworker, who summoned the police for assistance. Appellant fled with the child before the police arrived. DHS obtained an emergency order to take custody of K.T., and the trial court found probable cause after affording appellant two hearings on the issue.

In the adjudication order dated December 12, 2007, the trial court found that K.T. was dependent-neglected and that returning her to appellant's custody was not in her best interest. In reaching this conclusion, the trial court identified appellant's long-term use of drugs as the core problem preventing appellant from maintaining custody. The court took note of its experience with appellant from past proceedings involving appellant's now adult children. The court recalled that appellant had a history of noncompliance and of disobeying court directives. The court ordered appellant to submit to a psychological evaluation and to follow recommendations, to enter and complete inpatient drug treatment, to attend counseling, to undergo random drug screens, and to obtain employment and stable housing. In this order, Ron Mitchel was identified as K.T.'s putative father. He declined services until paternity was established.

At a review hearing in April 2008, the court found that DHS had failed to make timely referrals for services. As a consequence, progress in the case was delayed by three months, and the court announced its inclination to allow appellant additional time to achieve reunification. The court

stated, however, that it did not consider appellant's chances of rehabilitation as promising, and the court cautioned that it may not allow additional time if appellant did not put forth a good-faith effort. The court continued its previous orders and further directed appellant to enter a drug-free halfway house following residential treatment and to undergo random drug screens at least once a month.

In the permanency planning order entered on July 29, 2008, the trial court found that appellant had refused drug screens and that she had declined to enter residential treatment. Appellant also had not obtained stable housing or employment, and the court found that appellant had failed to cooperate with DHS and had not taken any material steps to achieve reunification. Despite appellant's lack of compliance, the court granted appellant additional time given the previous delay in services, noting that appellant had at least submitted to a psychological evaluation and had begun counseling. The court advised appellant that it would authorize the goal of the case plan to be changed to termination if appellant had not made significant progress by the next hearing.

The court held another permanency planning hearing in October 2008. In the order stemming from that hearing, the court found that there were no compelling reasons to continue the goal of reunification but that it would not change the goal to termination due to the initial lack of services. The court found that appellant maintained a hostile attitude and continued to refuse drug screens following residential treatment, despite warnings that any refusal would be considered a positive test. The court increased the number of random drug screens to twice a month and cautioned appellant that living a drug-free life included finding meaningful employment.

After a hearing in January 2009, the trial court changed the goal of the case plan to the termination of appellant's parental rights. In its findings, the court found that appellant continued to test positive for drugs and stated that it did not believe appellant's claim that the caseworker had falsified the drug screens. The court noted that appellant had never held a job and that she was not responsible for her own housing and was dependent on others for support. The court stated that her dependency on others and absence of employment contributed to her lifestyle of cocaine abuse. The trial court ordered appellant to obtain her own housing rather than continue living with relatives, stating that appellant needed to live independently and drug free in order to demonstrate stability.

The trial court scheduled the termination hearing for April 14, 2009, but the court continued the hearing to June 9, 2009. Paula Smith, appellant's former caseworker, testified that appellant completed a thirty-day inpatient program in September 2008 and an after-care program in November 2008 but that appellant continued to test positive for drugs. The last positive screen occurred on November 20, 2008. In 2009, all of appellant's screens were negative, including the one taken on the day of the termination hearing. Smith testified that appellant had not maintained stable employment or housing throughout the proceedings. She said that appellant once lived on her own in a house for six months and that appellant's last known residence was with her uncle in Wrightsville. Smith testified that appellant quit one job after two days and that appellant said that she was working for Avon. Smith said, however, that appellant never provided any proof of earnings. Smith also stated that appellant reported that she was taking classes at Eastern College.

Juanita Lloyd–Thomas succeeded Smith as appellant's caseworker in March 2009. She testified that appellant had provided no proof of attendance at NA meetings and that attendance was important in order to prevent a relapse. Lloyd–Thomas stated that, although appellant was argumentative, she had experienced no problems with appellant during visitations and that appellant and K.T. were bonded to one another. She said that appellant did not understand why she could not live with her uncle and that she had encouraged appellant to apply with a temporary agency while searching for full-time employment. Lloyd–Thomas testified that she did not believe that appellant was stable enough to provide for the needs of the child.

Sylvia Jones, appellant's therapist, testified that she counseled appellant at least three times a month but that, since April 2009, she had not seen appellant as often. She worked with appellant regarding stress management and interpersonal skills. Jones felt that appellant had benefited from her services and that appellant had made progress. She said that appellant had been cooperative and that appellant reported that she was receiving medical-assistant training at a college.

Dr. Paul Deyoub, a forensic psychologist, conducted a psychological evaluation of appellant in March 2008. He offered a diagnosis of cocaine and cannabis dependency and an Axis II personality disorder that included elements of psychopathic deviancy and antisocial personality deviancy. Dr. Deyoub explained that a personality disorder meant that a person exhibits a pervasive pattern of maladjustment, hostility toward authority, disorderly conduct, poor work history, and relationship problems. He said that these tendencies are acquired over a lifetime and cannot be cured but could be treated with therapy

geared toward holding the person responsible. Dr. Deyoub stressed that it was important for someone who was dependent on drugs and who had a personality disorder to maintain stable employment. He testified that having a job signifies that a person has abandoned her drug use because one cannot effectively work and abuse drugs. He further testified that persons with a personality disorder avoid conventional behavior and that having a job changes that pattern of avoidance. Dr. Deyoub stated that appellant's prospects for overcoming her problems were poor at age thirty-six.

In its order terminating appellant's parental rights, the trial court recounted the history of the case and gave little weight to appellant's negative drug tests in recent months. Further, the court found that, even accepting her eleventh-hour period of sobriety, appellant had failed to establish stability in the areas of housing and income. The court credited Dr. Deyoub's testimony outlining the need for appellant to demonstrate stability by maintaining employment, and the court noted the necessity of appellant to show that she could live independently of others. Finally, the trial court was not impressed with appellant's purported enrollment in college in lieu of obtaining employment.

On appeal, appellant contends that the trial court erred in finding sufficient evidence of grounds to support termination and in finding, in terms of potential harm, that termination was in K.T.'s best interest. She discusses these issues as one point, stating that the evidence and her arguments relate to both matters. Specifically, appellant argues that she complied with many aspects of the case plan and that she made overwhelming progress in overcoming her addiction to drugs. She asserts that she maintained stable housing by living with her uncle and

complains that it was not fair for the court to require her to live independently so late in the proceedings. Appellant contends that her lack of employment is not an acceptable basis for terminating her rights. Appellant also argues that the trial court overly emphasized her past transgressions. In addition, she points out that she regularly visited K.T. and that they shared a bond.

Pursuant to Arkansas Code Annotated section 9–27–341(b)(3)(A)(i) and (ii) (Repl. 2009), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. In addition, the proof must establish at least one of several statutory grounds. Ark.Code Ann. § 9–27–341(b)(3)(B). One of those grounds is that the juvenile has been adjudicated by the court to be dependent-neglected and has continued out of the custody of the parents for twelve months and, despite a meaningful effort by the department to rehabilitate the parents and correct the conditions that caused removal, those conditions have not been remedied by the parents. Ark.Code Ann. § 9–27–341(b)(3)(B)(ii)(*a*). Another ground is that other factors arose subsequent to the filing of the original petition for dependency-neglect which demonstrate that returning custody to the parents is contrary to the juvenile's health, safety, and welfare and that, despite an offer of appropriate services, the parents have manifested the incapacity or indifference to remedy the subsequent factors. Ark.Code Ann. § 9–27–341(b)(3)(B)(vii)(*a*).

Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Strickland v. Ark. Dep't of Human Servs.*, 103 Ark.App. 193, 287 S.W.3d 633 (2008). Thus, the law places a heavy burden on a party seeking to terminate the parental relationship, and that party must prove facts warranting termination by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof which will produce in the fact-finder a firm conviction regarding the allegation sought to be established. *Id.* On appeal, we do not reverse the trial court's finding that the disputed fact was proved by clear and convincing evidence unless the court's finding is clearly erroneous. *Hall v. Ark. Dep't of Human Servs.*, 101 Ark.App. 417, 278 S.W.3d 609 (2008). We give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Id.*

Our review of the record reflects that appellant was never more than in partial compliance with the case plan. As of the final permanency planning hearing, appellant had completed drug treatment, but she continued to use drugs. Although appellant maintained negative screenings afterward, at the time of the termination hearing, she still had not complied with the court's directive that she live independently and obtain employment. In those respects, the court stressed the vital importance of compliance with those conditions as a necessary demonstration of stability and as proof that she had truly mended her ways. We perceive no error in the trial court ordering appellant to live on her own toward the end of the case. Appellant had ample opportunity, six months, to achieve that goal before the termination hearing took place. We also cannot find error in the trial court taking note of appellant's history. Past actions of a parent over a meaningful period of time are good indicators of what the future may hold. *In re Adoption of K.M.C.*, 62 Ark. App. 95, 969 S.W.2d 197 (1998). On the whole, we are not left with a definite and

firm conviction that a mistake was made. Accordingly, we affirm the order terminating appellant's parental rights.

Affirmed.

PITTMAN and BAKER, JJ., agree.